UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 4:21-cv-230 |
| v. | ) | |
| | ) | |
| ELIZABETH DEMBO | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

Plaintiff, the United States of America (United States), by its undersigned counsel, brings this action against Defendant Elizabeth Dembo (Dembo) seeking (1) monetary penalties for violations of the Controlled Substances Act (CSA), 21 U.S.C. § 801, *et seq.*, and (2) damages and monetary penalties for violations of the False Claims Act (FCA), 31 U.S.C. § 3729, *et seq.*

1.     The nation is experiencing a national public health emergency involving opioid abuse.  The dispensing and distribution of controlled substances, including prescription opioid painkillers, without a legitimate medical purpose and outside the usual course of professional practice exacerbate this crisis.  This crisis impacts Missouri individuals and families as well as the Medicare and Medicaid programs when their funds are used to pay for improperly dispensed controlled substances.

2.     Pharmacists who dispense and distribute prescription opioid painkillers and other controlled substances without a legitimate medical purpose and outside the usual course of professional practice contribute significantly to the opioid crisis.

3.     Dembo violated the CSA by knowingly dispensing controlled substances pursuant to prescriptions that she knew or should have known had no legitimate medical purpose and were

dispensed outside the usual course of professional pharmacy practice.

4.      During this same time, Dembo also violated the FCA by causing the Medicaid and Medicare federal healthcare programs to be billed for medically unnecessary controlled substances and other drugs.

## JURISDICTION AND VENUE

5.      Jurisdiction is founded on the civil provisions of the CSA, 21 U.S.C. § 842(c)(1)(A); the FCA, 31 U.S.C. §§ 3729-3733; and under 28 U.S.C. §§ 1331, 1345, and 1355(a).

6.      Venue is proper in the Eastern District of Missouri under 28 U.S.C. § 1391(b) and 31 U.S.C. § 3732(a), because a substantial part of the events or omissions giving rise to the claims herein occurred in this District.

7.      This Court has personal jurisdiction over Dembo because, at all relevant times, she transacted business in this District and Division in Creve Coeur, Missouri, within St. Louis County.

## PARTIES

8.      Plaintiff is the United States.  Acting through the Department of Health and Human Services (HHS) and, in turn, the Centers for Medicare & Medicaid Services (CMS), the United States administers (1) Medicare, a federally funded health insurance program for the elderly and disabled established by Title XVIII of the Social Security Act (SSA), 42 U.S.C. §§ 1395 *et seq.*; and (2) Medicaid, a federally funded grant program established by Title XIX of the SSA, 42 U.S.C. §§ 1396 *et seq.*, to enable States, including Missouri, to provide medical assistance and related services to indigent and low income persons.  At all relevant times, the State of Missouri, through its Department of Social Services (DSS), MO HealthNet Division, administered the state-portion of the Medicaid program for indigent patients in Missouri on behalf of and at the direction of the United States.

9.      Defendant is Dembo.  Dembo became a licensed pharmacist in Missouri in or around July 2013.  As a licensed pharmacist, Dembo had a responsibility to act in the usual course of professional pharmacy practice, and to refuse to fill prescriptions that were not issued for a legitimate medical purpose by an individual practitioner acting in the usual course of professional practice; a pharmacist breaches this duty when he or she fills prescriptions without addressing common indicators of diversion or "red flags," i.e. indicia that the prescriptions were not issued for a legitimate medical purpose by a practitioner acting in the usual course of professional practice.  From on or about September 26, 2015 to on or about March 5, 2018, Dembo was the pharmacist-in-charge of Olive Street Pharmacy, LLC (Olive Street), a retail pharmacy unmarked by any exterior signage and located inside an office building at 10420 Old Olive Street Road, Suite 103, Creve Coeur, Missouri 63141, as pictured below:



**THE CONTROLLED SUBSTANCES ACT**

10.     The CSA and its implementing regulations set forth a comprehensive regulatory regime for the manufacture, distribution, and dispensing of controlled substances.  Congress enacted the CSA to facilitate the availability of controlled substances for authorized medical use, while also preventing controlled substances from being diverted out of legitimate channels for illegal purposes.  The CSA accordingly establishes a closed regulatory system under which it is

3

unlawful to manufacture, distribute, dispense, or possess any controlled substance except in a manner authorized by the CSA.  21 U.S.C. § 841(a)(1).

11.     Under the CSA, controlled substances are categorized into five schedules based on several factors, including: the substance's medical use, potential for abuse, and safety or dependence liability.

12.     Schedule II drugs are drugs with a "high potential for abuse" that may "lead to severe psychological or physical dependence" but nonetheless have a "currently accepted medical use in treatment."  21 U.S.C. § 812(b)(2).  Examples of schedule II drugs include oxycodone (brand names OxyContin and Percocet), dextroamphetamine-amphetamine (brand name Adderall), and fentanyl (brand name Duragesic and Subsys).

13.     Schedule III drugs are drugs with less potential for abuse than schedule II drugs but that nonetheless may still lead to "moderate or low physical dependence or high psychological dependence." 21 U.S.C. § 812(b)(3).  Schedule III drugs also have "a currently accepted medical use in treatment.  *Id.*  Examples of schedule III drugs include buprenorphine (brand name Suboxone and Butrans) and acetaminophen with codeine.

14.     Schedule IV drugs have a lower potential abuse than schedule III drugs but still may lead to physical or psychological dependence when abused. 21 U.S.C. § 812(b)(4).  Examples of schedule IV drugs include alprazolam (brand name Xanax), diazepam (brand name Valium), lorazepam (brand name Ativan), temazepam (brand name Restoril), zolpidem (brand name Ambien), and carisoprodol (brand name Soma).

15.     The CSA requires pharmacies that distribute and dispense controlled substances to obtain a registration from the Drug Enforcement Administration (DEA).  21 U.S.C. § 822(a).  A registered pharmacy is only permitted to distribute or dispense controlled substances "to the extent

authorized by their registration and in conformity with" the CSA.  21 U.S.C. § 822(b).

16.     Pharmacies may be registered to "dispense" controlled substances in Schedules II through V.  21 U.S.C. § 823(f).  The CSA defines dispensing to mean delivering a controlled substance to an ultimate user (e.g., a patient) by, or pursuant to a lawful order of, a practitioner (i.e. a prescription).  *See* 21 U.S.C. § 802(10).  Distributing means delivering a controlled substance other than by dispensing or administering. *See id.* at § 802(11).

17.     The agents and employees of a dispenser of controlled substances are not required to have a separate DEA registration "if such agent or employee is acting in the usual course of his business or employment."  21 U.S.C. § 822(c)(1).

18.     Pharmacies cannot dispense a Schedule II drug to an ultimate end user without the written prescription of the practitioner, such as a physician.  21 U.S.C. § 829(a).  Pharmacies cannot dispense Schedule III and Schedule IV controlled substances to an end user without a written or oral prescription from a practitioner.  21 U.S.C. § 829(b).

19.     A prescription (written or oral) is legally valid under the CSA only if issued for "a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice."  21 C.F.R. § 1306.04(a).  "An order purporting to be a prescription issued not in the usual course of professional treatment . . . is not a prescription within the meaning and intent" of 21 U.S.C. § 829, "and the person knowingly filling such a purported prescription, as well as the person issuing it, shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances."  *Id.*  "Person" is defined to include an individual, a corporation, a partnership, an association, and any other legal entity.  21 C.F.R. §§ 1300.01, 1306.02.

20.     "The responsibility for proper prescribing and dispensing of controlled substances

is upon the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription."  21 C.F.R. § 1306.04(a).

21.      "A prescription for a controlled substance may only be filled by a pharmacist, acting in the usual course of his professional practice and either registered individually or employed in a registered pharmacy . . . ."  21 C.F.R. § 1306.06.

## TIRF REMS PROGRAM

22.      Certain immediate-release fentanyl drugs have a particularly high potential for misuse, addiction, overdose, and other serious problems, including death.  Due to these heightened risks, these drugs are available only through the Transmucosal Immediate Release Fentanyl (TIRF) Risk Evaluation and Mitigation Strategy (REMS) program.

23.      The TIRF REMS program is mandated by the Food and Drug Administration to ensure informed risk-benefit decisions before initiating TIRF treatment and to ensure appropriate use of TIRF medicines while patients are on treatment.

24.      TIRF REMS products include Abstral (sublingual tablet), Actiq (lozenge), Fentora (buccal tablet), Lazanda (nasal spray), Onsolis (buccal soluble film), and Subsys (sublingual spray).

25.      Prescribers of TIRF products are required to enroll in the TIRF REMS program, which, in turn, requires them to review TIRF educational materials and successfully complete a knowledge assessment.

26.      Similarly, outpatient pharmacies must enroll in the TIRF REMS program before they are legally permitted to dispense TIRF products.  For pharmacies, enrollment in the TIRF REMS program requires an authorized pharmacist to review TIRF educational materials and successfully complete a knowledge assessment.

27.     Pursuant to the TIRF REMS program parameters, TIRF medicines are indicated only for the management of breakthrough pain in cancer patients who are already receiving and who are tolerant to around-the-clock opioid therapy for underlying persistent cancer pain.  Patients are considered opioid tolerant if, for at least one week, they have been taking: 60 milligrams of oral morphine per day; 25 micrograms of transdermal (patch) fentanyl per hour; 30 milligrams of oral oxycodone per day; 8 milligrams of oral hydromorphone per day; 25 milligrams of oral oxymorphone per day; 60 milligrams of oral hydrocodone per day; or an equianalgesic dose of another oral opioid daily.

28.     The TIRF REMS program provides that patients must remain on around-the-clock opioids while using a TIRF product.

29.     Additionally, the TIRF REMS program provides initial dosing instructions for patients starting TIRF therapy.   For patients starting Subsys, the initial dosage is always 100 micrograms, unless the patient was previously taking certain amounts of Actiq.

30.     TIRF medications are contraindicated for patients who are not opioid tolerant and for, among other things, the management of acute or postoperative pain including headache or migraine pain, dental pain, or acute pain in the emergency department.

### THE MEDICAID PROGRAM

31.     At all relevant times, the Missouri Medicaid program, jointly funded and operated by the federal and state governments, provided medical benefits to low income beneficiaries living in Missouri.

32.     Medicaid provides coverage for prescription drugs only when used for medically accepted indications.  42 U.S.C. § 1396r-8(d)(1)(B)(i), (k)(3); 13 C.S.R. § 70-20.030.

33.     At all relevant times, Olive Street was a participating Medicaid provider.

34.     As a Medicaid provider, Olive Street agreed to and was required to comply with all the applicable rules and regulations of the Medicaid program, DSS, and HHS.  As the pharmacist-in-charge of Olive Street, Dembo knew or should have known that Olive Street was not entitled to Medicaid payments for prescription drug reimbursement claims that did not comply with the applicable rules and regulations, including claims for prescription drugs that were not medically necessary.

35.     Claims for Medicaid beneficiaries who purchased their prescription drugs at Olive Street were submitted for adjudication and payment to DSS and its fiscal intermediaries for processing and payment by Olive Street through its agents and employees, including Dembo.

## THE MEDICARE PROGRAM

36.     Congress established the Medicare program to provide health insurance coverage for people age 65 or older and for people with certain disabilities or afflictions.  *See* 42 U.S.C. §§ 426, 426a.

37.     The Medicare program consists of four parts:  A, B, C, and D.  Dembo submitted, or caused to be submitted, claims under Medicare Part D.  Medicare Part D is an optional prescription drug benefit program.  42 U.S.C. § 1395w-101(a)(3)(A); 42 C.F.R. § 423.30(a).

38.     Medicare Part D is based on a private market model.  Medicare contracts with private entities known as Part D "Plan Sponsors" to administer prescription drug plans and deliver Part D, i.e. prescription, benefits to enrolled beneficiaries.  Throughout the year, CMS makes monthly payments to the Part D Plan Sponsor for each Part D beneficiary enrolled in the plan.  42 C.F.R. § 423.329(a)(1).

39.     By statute, all agreements between a Part D Plan Sponsor and HHS must include a provision whereby the Plan Sponsor agrees to comply with the standards and terms and conditions

of payment governing the Part D program.  42 U.S.C. § 1395w-112.  In turn, all subcontracts between Part D Plan Sponsors and downstream entities, such as pharmacies like Olive Street, obligate the downstream entity to comply with all applicable federal laws, regulations, and CMS instructions.  42 C.F.R. § 423.505(i)(4)(iv).

40.   Medicare only covers drugs that are used for a medically accepted indication, which means a use that is approved under the Food, Drug, and Cosmetic Act (FDCA), 21 U.S.C. § 301, *et seq.*, or a use which is supported by one or more citations included or approved for inclusion in one of the specified compendia.  42 U.S.C. § 1395w-102(e)(1) & (e)(4); 42 U.S.C. § 1396r-8(g)(1)(B)(i) & (k)(6); 42 C.F.R. § 423.100.

41.   Prescriptions for controlled substances that are not issued for a legitimate medical purpose, such as for recreational use, are not for "medically accepted indications" and are therefore not covered Medicare Part D drugs.  42 U.S.C. § 1395w-102(e)(1).

42.   Prescriptions for controlled substances that are not issued for a legitimate medical purpose, such as for recreational use, are not "valid prescriptions" and are therefore not covered Medicare Part D drugs.  42 C.F.R. § 423.104(h).

43.   At all relevant times, Olive Street was a Medicare provider with various Part D Plan Sponsors.

44.   As the pharmacist-in-charge of Olive Street, Dembo knew or should have known that Olive Street was not entitled to Medicare payments for prescription drug reimbursement claims that did not comply with the applicable rules and regulations, including claims for prescriptions drugs that were not medically necessary or were not dispensed pursuant to valid prescriptions.

45.   Claims for Medicare Part D beneficiaries who purchased their prescription drugs at

Olive Street were submitted for adjudication and payment to, ultimately, CMS and its fiscal intermediaries for processing and payment by Olive Street through its agents and employees, including Dembo.

## FACTUAL BACKGROUND

46.     As an outpatient retail pharmacy, Olive Street purchases, stores, and dispenses controlled substances.  At all relevant times, Olive Street was registered with the DEA as a retail pharmacy to purchase, store, and dispense Schedules II-V controlled substances.

47.     At all relevant times, Olive Street was registered with the TIRM REMS program to dispense TIRF products.

48.     Between 2014 and 2019, Olive Street purchased hundreds of thousands of dosage units of schedule II and schedule III controlled substances.  In many categories, Olive Street's purchasing categories exceeded Missouri state averages.   In 2016 (while Dembo was the pharmacist-in-charge), Olive Street purchased nearly three times more fentanyl than the Missouri state average and approximately 3.59 times more fentanyl than the national average.  And in 2017 (again while Dembo was the pharmacist-in-charge), Olive Street purchased over twice as much oxycodone as the Missouri state and national averages.

49.     Dembo failed to detect and address indicators of drug diversion, or "red flags," indicating that prescriptions were not legitimate.  Dembo was presented with multiple red flags and failed to conduct further and sufficient inquiry to determine whether the prescriptions she filled were legitimate.

50.     For example, Dembo disregarded numerous instances in which the combined total of daily "morphine milligram equivalents" for a patient grossly exceeded safe amounts.

51.     A morphine milligram equivalent (MME) is an opioid potency value that uses a

conversion factor to standardize the daily dose of an opioid into the equivalent dose of morphine. This provides a mechanism to assess the cumulative daily strength of all opioid prescriptions a patient is taking in a way that is standardized across different drugs, formulations, strengths, and dosage forms. For example, a 10-milligram dose of oxymorphone (a Schedule II drug) is equivalent in strength to approximately 30 milligrams of morphine. Thus, a 10-milligram dose of oxymorphone can be expressed as 30 MMEs.

52.     The Centers for Disease Control and Prevention (CDC) recommends caution when using opioids at any dosage, carefully reassessing the risks and benefits of opioids when MMEs are 50 or higher, and avoiding or carefully justifying dosages of 90 MMEs or higher.

53.     Dembo also dispensed prescriptions for opioids to patients at the same time as other medications that, when used in combination, are known to dangerously increase the opioid-produced euphoric high, as well as the risk of respiratory depression, cardiac depression, overdose, and death. Such medications are known as opioid "potentiators." Benzodiazepines, for example, are a class of drugs commonly known to be opioid potentiators; because of this, the CDC discourages use of benzodiazepines simultaneously with opioids.

54.     Dembo routinely dispensed a combination of drugs colloquially known as the "holy trinity." The holy trinity is comprised of an opioid (such as oxycodone), a benzodiazepine (such as alprazolam), and a muscle relaxer (such as carisoprodol). The "new" holy trinity is similar but includes a stimulant (such as dextroamphetamine-amphetamine or phentermine) instead of a muscle relaxer. These combinations of drugs increase the euphoric, addictive, and dangerous effects of opioids, and prescriptions for these combinations are well known red flags in the pharmacy industry.

55.     Furthermore, Dembo filled prescriptions for Subsys, a TIRF drug subject to the TIRF REMS program requirements, despite knowing that the patients receiving Subsys did not meet various program requirements, including because they did not have breakthrough pain due to cancer.

56.     The vast majority of the Subsys that Dembo dispensed was prescribed by Philip Dean (Dean), a neurologist who had an office located in Warrenton, Missouri, which is approximately 45 miles away from Olive Street.  In 2018, Dean pled guilty to making false statements to the Medicare and Medicaid programs and to illegally distributing prescription opioids.  He also admitted that he prescribed controlled substances (including Subsys, oxycodone, hydrocodone, Adderall, Duragesic, and codeine) to women with whom he had lived and with whom he had had personal relationships.  *See generally United States v. Dean*, No. 4:18-CR-220-ERW (E.D. Mo. filed Mar. 15, 2018).

57.     Dembo knew that Dean was having intimate relationships with at least one of the women for whom he was prescribing controlled substances, specifically, R.W.  Despite this knowledge, Dembo continued to dispense the controlled substances prescribed by Dean to R.W. and to others.

58.     Dembo knew that Dean habitually prescribed controlled substances to individuals who did not have a medical necessity for them, but instead used them due to their opioid abuse disorders or for recreational purposes.  Despite this knowledge, Dembo continued to dispense the controlled substances prescribed by Dean to these individuals and to others.

59.     The dispensing of a controlled substance in the face of the warning signals described above, without first ensuring the prescription was issued for a legitimate purpose by a practitioner acting in the usual course of professional practice, violates the CSA.  A pharmacist

who fills a prescription in the face of one or more of these red flags without taking sufficient steps to resolve the red flag(s) exceeds his or her authorization to dispense controlled substances under the CSA.

60.     Submitting or causing the submission of claims to the Medicaid and/or Medicare federal healthcare programs for medications (whether scheduled controlled substances or not) in the face of the warning signals described above, without first ensuring the prescriptions are valid and medically necessary, violates the FCA.  Based on the red flags described above, Dembo knew that the prescriptions she filled were invalid and not used for a medically accepted indication, but nonetheless submitted or caused to be submitted claims for their reimbursement to the Medicaid and Medicare federal healthcare programs.  If Medicaid and Medicare had known that these prescriptions were invalid, they would not have paid for them.

## SPECIFIC EXAMPLES OF CSA AND FCA VIOLATIONS

61.     During the time she was the pharmacist-in-charge at Olive Street, Dembo violated the CSA by dispensing controlled substances in violation of her corresponding responsibility and outside the usual course of pharmacy practice.  She further violated the FCA when she knowingly submitted claims or caused Olive Street to submit claims for reimbursement for medically unnecessary and invalid prescriptions to the Medicaid and Medicare federal healthcare programs.

62.     Specifically, Dembo repeatedly failed to identify and address suspicious circumstances and indicators of diversion, described above as red flags.  Dembo knowingly filled prescriptions for controlled substances without resolving those red flags over and over again.

*Patient J.D.*

63.     From in or about January 2016 to in or about April 2016, Dembo filled prescriptions written by Dean for Patient J.D. while disregarding red flags indicating that those prescriptions

were not issued for a legitimate medical purpose by an individual practitioner acting in the usual course of professional practice.

64.     Dembo dispensed Subsys to Patient J.D. despite knowing that Patient J.D. did not have breakthrough pain due to cancer.

65.     Dembo filled dangerous combinations of prescriptions for Patient J.D.  In multiple instances, Dembo filled the holy trinity for Patient J.D.  For example, on February 4, 2016, Dembo filled Duragesic 100 microgram per hour patches (an opioid), diazepam 5 milligram tablets (a benzodiazepine), and tizanidine 4 milligram tablets (a muscle relaxer) for Patient J.D. Furthermore, on the same date, Dembo filled a prescription for gabapentin 300 milligram capsules for Patient J.D.; gabapentin is a known opioid potentiator.

66.     On another occasion, Dembo filled prescriptions for Patient J.D. that grossly exceeded CDC guidelines.  Specifically, on January 7, 2016, Dembo filled, among other things, Duragesic 100 microgram per hour patches, hydrocodone-acetaminophen 10-325 milligram tablets (one table four times daily), and Subsys 1,200 microgram spray (one dose up to six times per day). The combined MMEs for these prescriptions totaled 1,576, or approximately 17.5 times the level of MMEs that the CDC recommends avoiding.  Dispensing these prescriptions put Patient J.D. at extremely high risks for overdose and death.

67.     Additionally, the January 7, 2016 combination that Dembo filled contained two short-acting narcotic painkillers: Subsys and hydrocodone.  The presentment of more than one prescription for a short-acting narcotic painkiller is a red flag in the pharmacy industry, and taking a short-acting narcotic painkiller in combination with another one produces heightened risks of an adverse event, including possible respiratory failure.

68.     The chart attached as Exhibit 1 contains Schedule II and Schedule IV drugs, plus

14

gabapentin and muscle relaxers, that Dembo filled for Patient J.D. from January 2016 to April 2016.  Each of the drugs listed in the chart in Exhibit 1 is a prescription drug under the FDCA.

69.     All prescriptions in Exhibit 1 were billed to the Medicaid federal healthcare program, thereby implicating FCA liability, as indicated.

70.     Medicaid paid approximately $29,000 for Patient J.D.'s prescriptions listed in Exhibit 1.  Based on the red flags described above, Dembo knew that the prescriptions listed in Exhibit 1 were not used for a medically accepted indication and lacked a legitimate medical purpose.  If Medicaid had known that these prescriptions were invalid, it would not have paid for them.

71.     Dembo knowingly dispensed these drugs pursuant to prescriptions that were issued without a legitimate medical purpose and outside the usual course of professional practice in violation of 21 U.S.C. §§ 829(a) and (b), and 842(a)(1), and 21 C.F.R. § 1306.04.

72.     Dembo dispensed these controlled substances while acting outside the usual course of the professional practice of pharmacy in violation of 21 U.S.C. § 842(a)(1) and 21 C.F.R. § 1306.06.

*Patient M.R.*

73.     From in or about October 2015 to in or about June 2017, Dembo filled prescriptions written by Dean for Patient M.R. while disregarding red flags indicating that those prescriptions were not issued for a legitimate medical purpose by an individual practitioner acting in the usual course of professional practice.

74.     Dembo dispensed Subsys to Patient M.R. despite knowing that Patient M.R. did not have breakthrough pain due to cancer.  In fact, the International Classification of Diseases (ICD)-10 code used to support the Subsys prescriptions for Patient M.R. was M25.571, or pain in

the right ankle and joints of right foot.

75.     Dembo failed to ensure that Patient M.R. was opioid tolerant before dispensing Subsys to Patient M.R., and the first Subsys prescription that Dembo dispensed to Patient M.R. was 400 micrograms in strength, or four times the maximum initial dosage.  Dembo did not take steps to ensure that Patient M.R. had previously taken lower amounts of Subsys or the requisite amounts of Actiq that could justify dispensing 400 micrograms of Subsys to Patient M.R.

76.     Additionally, Dembo filled dangerous combinations of prescriptions for Patient M.R.  For example, Dembo filled prescriptions for multiple long-acting narcotic painkillers at the same time, and at times filled opioids at the same time as a benzodiazepine, or with a muscle relaxer, or with a stimulant.  Such combinations of drugs produce heightened risks of an adverse event, including possible respiratory failure.  Dangerous combinations such as those dispensed to Patient M.R. are red flags because they are sought after by those who seek prescriptions for the non-medical purpose of increasing the euphoric effects of opioids.

77.     In multiple instances, the combined MMEs of the prescriptions that Dembo dispensed to Patient M.R. were dangerously high.  For example, on some occasions, Dembo dispensed (among other things) both OxyContin 20 milligram tablets (to be taken twice a day) and fentanyl 100 microgram per hour patches to Patient M.R.  These two medications alone amount to a total of 300 MMEs daily: over three times the level of daily MMEs that the CDC recommends avoiding.

78.     On another occasion—in October 2015—Dembo dispensed opioids (namely, OxyContin, oxycodone, and Subsys) that amounted to 468 MMEs per day: over five times the maximum dosage that the CDC recommends avoiding.

79.     The chart attached as Exhibit 2 contains Schedule II-IV drugs, plus non-scheduled

muscle relaxers, that Dembo filled for Patient M.R. from October 2015 to June 2017.  Each of the drugs listed in the chart in Exhibit 2 is a prescription drug under the FDCA.

80.     All but one prescription in Exhibit 2 were billed to the Medicaid federal healthcare program, thereby implicating FCA liability, as indicated.

81.     Medicaid paid approximately $68,000 for Patient M.R.'s prescriptions listed in Exhibit 2.  Based on the red flags described above, Dembo knew that the prescriptions listed in Exhibit 2 were not used for a medically accepted indication and lacked a legitimate medical purpose.  If Medicaid had known that these prescriptions were invalid, it would not have paid for them.

82.     Dembo knowingly dispensed these drugs pursuant to prescriptions that were issued without a legitimate medical purpose and outside the usual course of professional practice in violation of 21 U.S.C. §§ 829(a) and (b), and 842(a)(1), and 21 C.F.R. § 1306.04.

83.     Dembo dispensed these controlled substances while acting outside the usual course of the professional practice of pharmacy in violation of 21 U.S.C. § 842(a)(1) and 21 C.F.R. § 1306.06.

*Patient T.K.*

84.     From in or about October 2015 to in or about February 2016, Dembo filled prescriptions written by Dean for Patient T.K. while disregarding red flags indicating that those prescriptions were not issued for a legitimate medical purpose by an individual practitioner acting in the usual course of professional practice.

85.     Dembo dispensed Subsys to Patient T.K. despite knowing that Patient T.K. did not have breakthrough pain due to cancer.  In fact, the ICD-10 codes used to support the Subsys prescriptions for Patient T.K. were E11.44 (type 2 diabetes with diabetic amyotrophy), M54.7

17

(panniculitis affecting regions of neck and back, lumbosacral region), F51.09 (insomnia not due to a substance or known physiological condition), and M99.53 (intervertebral disc stenosis of neural canal of lumbar region).

86.     Dembo failed to ensure that Patient T.K. was opioid tolerant before dispensing Subsys to Patient T.K., and the first Subsys prescription that Dembo dispensed to Patient T.K. was 400 micrograms in strength, or four times the maximum initial dosage.  Dembo did not take steps to ensure that Patient T.K. had previously taken lower amounts of Subsys or the requisite amounts of Actiq that could justify dispensing 400 micrograms of Subsys to Patient T.K.

87.     Dembo also dispensed other short-acting narcotic painkillers, such as oxycodone, to Patient T.K. at the same time as Subsys.  The presentment of more than one prescription for a short-acting narcotic painkiller is a red flag in the pharmacy industry, and taking a short-acting narcotic painkiller in combination with another one produces heightened risks of an adverse event, including possible respiratory failure.

88.     The levels of MMEs that Dembo dispensed to Patient T.K. were dangerously high. For example, in December 2015, Dembo dispensed oxycodone and Subsys to Patient T.K., for a total of 621 MMEs daily, or nearly seven times the level of daily MMEs that the CDC recommends avoiding.

89.     By disregarding all of these red flags, Dembo put Patient T.K. at risk of overdose.

90.     The chart attached as Exhibit 3 contains Schedule II and Schedule IV drugs that Dembo filled for Patient T.K. from October 2015 to February 2016.  Each of the drugs listed in the chart in Exhibit 3 is a prescription drug under the FDCA.

91.     All prescriptions in Exhibit 3 were billed to the Medicaid federal healthcare program, thereby implicating FCA liability, as indicated.

18

92.     Medicaid paid approximately $75,000 for Patient T.K.'s prescriptions listed in Exhibit 3.  Based on the red flags described above, Dembo knew that the prescriptions listed in Exhibit 3 were not used for a medically accepted indication and lacked a legitimate medical purpose.  If Medicaid had known that these prescriptions were invalid, it would not have paid for them.

93.     Dembo knowingly dispensed these drugs pursuant to prescriptions that were issued without a legitimate medical purpose and outside the usual course of professional practice in violation of 21 U.S.C. §§ 829(a) and (b), and 842(a)(1), and 21 C.F.R. § 1306.04.

94.     Dembo dispensed these controlled substances while acting outside the usual course of the professional practice of pharmacy in violation of 21 U.S.C. § 842(a)(1) and 21 C.F.R. § 1306.06.

*Patient S.T.*

95.     From in or about August 2015 to in or about February 2017, Dembo filled prescriptions written for Patient S.T. while disregarding red flags indicating that those prescriptions were not issued for a legitimate medical purpose by an individual practitioner acting in the usual course of professional practice.  All but one of these prescriptions were written by Dean.

96.     Dembo dispensed Subsys to Patient S.T. despite knowing that Patient S.T. did not have breakthrough pain due to cancer.

97.     In some instances, Dembo filled Subsys prescriptions for Patient S.T. despite clear indications that the written prescriptions had been tampered with in various ways.  For instance, the strength and quantity of the Subsys prescription that Dembo filled on November 5, 2015 were clearly manipulated by writing over the original strength and quantity with black marker:

19

**Subsys Prescription Filled on November 5, 2015**



98.     In another instance, the date of the Subsys prescription that Dembo filled on

January 14, 2016 was clearly changed by writing over the original date with black marker; a review

of Patient S.T.'s file reveals that the original version of that prescription was dated over a month

earlier and had already been filled by Dembo on December 16, 2015:

**Subsys Prescription Filled on December 16, 2015**          **Subsys Prescription Filled on January 14, 2016**

          

99.     Dembo filled dangerous combinations of prescriptions for Patient S.T.  In multiple instances, Dembo filled OxyContin (an opioid), chlordiazepoxide (a benzodiazepine), and carisoprodol (a muscle relaxer) for Patient S.T.; by doing so, Dembo filled the holy trinity. Oftentimes, Dembo would fill a prescription for gabapentin at or around the same time as the holy trinity, such that Patient S.T. could be taking all four medications at one time; gabapentin is a known opioid potentiator.

100.    Dembo also filled dangerous levels of MMEs for Patient S.T.  For example, in December 2015, Dembo filled OxyContin 20 milligram tablets (one tablet twice daily) and Subsys 1,200 microgram spray (one dose up to four times daily), for a total of 924 MMEs daily: over ten times the maximum level of daily MMEs that the CDC recommends avoiding.

101.    The chart attached as Exhibit 4 contains Schedule II-IV drugs that Dembo filled for Patient S.T. from August 2015 to February 2017.  Each of the drugs listed in the chart in Exhibit 4 is a prescription drug under the FDCA.

102.    Most of the prescriptions in Exhibit 4 were billed to the Medicaid federal healthcare program, thereby implicating FCA liability, as indicated.

103.    Medicaid paid approximately $99,000 for Patient S.T.'s prescriptions listed in Exhibit 4.  Based on the red flags described above, Dembo knew that the prescriptions listed in Exhibit 4 were not used for a medically accepted indication and lacked a legitimate medical purpose.  If Medicaid had known that these prescriptions were invalid, it would not have paid for them.

104.    Dembo knowingly dispensed these drugs pursuant to prescriptions that were issued without a legitimate medical purpose and outside the usual course of professional practice in violation of 21 U.S.C. §§ 829(a) and (b), and 842(a)(1), and 21 C.F.R. § 1306.04.

105.    Dembo dispensed these controlled substances while acting outside the usual course of the professional practice of pharmacy in violation of 21 U.S.C. § 842(a)(1) and 21 C.F.R. § 1306.06.

*Patient E.H.*

106.    From in or about February 2017 to in or about February 2018, Dembo filled prescriptions written for Patient E.H. while disregarding red flags indicating that those prescriptions were not issued for a legitimate medical purpose by an individual practitioner acting in the usual course of professional practice.  According to Olive Street's records, the prescribing physician for these prescriptions was Stanley Librach (Librach).  On or about February 13, 2020, a federal grand jury indicted Librach for, among other things, illegally prescribing controlled substances in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2.  *See generally United States v. Ali, et al.*, No. 4:20-CR-00098-HEA (E.D. Mo. filed Feb. 13, 2020).

107.    On multiple occasions, Dembo filled oxycodone 30 milligram tablets and phentermine 37.5 milligram tablets at the same time for Patient E.H.  Thirty milligrams is the highest available strength of short-acting oxycodone; a prescription for oxycodone 30 milligrams is in itself a red flag, particularly where, as here, it is presented to the pharmacy by the same patient on multiple occasions.  Phentermine is a stimulant and an opioid potentiator; a prescription for phentermine that accompanies a prescription for oxycodone is another red flag, particularly where, as here, it is presented to the pharmacy by the same patient on multiple occasions.

108.    Dembo knew that prescriptions naming Librach as the prescribing physician should be carefully monitored and filled only after verifying that they were issued for a legitimate medical reason.

109.    Each time Dembo dispensed an oxycodone 30 milligram prescription for Patient

E.H., the cumulative daily MME total was 135, well above the level of daily MMEs that the CDC recommends avoiding.  This continued for approximately one year, at least.

110.    Despite all of these red flags presented by Patient E.H.'s prescriptions, Dembo continued to fill them without resolving the red flags.

111.    The chart attached as Exhibit 5 contains oxycodone and phentermine prescriptions that Dembo filled for Patient E.H. from February 2017 to February 2018.  Each of the drugs listed in the chart in Exhibit 5 is a prescription drug under the FDCA.

112.    None of the prescriptions listed in Exhibit 5 were billed to a federal healthcare program; thus, all of the prescriptions in Exhibit 5 implicate CSA liability only, as indicated.

113.    Dembo knowingly dispensed these drugs pursuant to prescriptions that were issued without a legitimate medical purpose and outside the usual course of professional practice in violation of 21 U.S.C. §§ 829(a) and (b), and 842(a)(1), and 21 C.F.R. § 1306.04.

114.    Dembo dispensed these controlled substances while acting outside the usual course of the professional practice of pharmacy in violation of 21 U.S.C. § 842(a)(1) and 21 C.F.R. § 1306.06.

*Patient H.L.*

115.    From in or about January 2017 to in or about February 2018, Dembo filled prescriptions written for Patient H.L. while disregarding red flags indicating that those prescriptions were not issued for a legitimate medical purpose by an individual practitioner acting in the usual course of professional practice.

116.    In multiple instances, Dembo filled the holy trinity, the new holy trinity, or a combination of both for Patient H.L.

117.    For example, in April 2017, Dembo filled oxycodone (an opioid), alprazolam (a benzodiazepine), and dextroamphetamine-amphetamine (a stimulant) for Patient H.L.; by doing so, Dembo filled the new holy trinity.

118.    Other times—in February 2017, for example—Dembo filled this same combination of drugs, with the addition of baclofen, a muscle relaxer and opioid potentiator.  The combination of oxycodone (an opioid), alprazolam (a benzodiazepine), and baclofen (a muscle relaxer) constitutes the holy trinity, in addition to the new holy trinity being fulfilled by the dextroamphetamine-amphetamine (stimulant), simultaneously.

119.    Dispensing these combinations was particularly problematic given that the dextroamphetamine-amphetamine and alprazolam that Dembo filled for Patient H.L. was prescribed by a physician from a completely different medical practice than the practice from which the other two prescriptions originated.  Where, as here, a patient presents prescriptions for suspect drug combinations from different providers, the pharmacist—as the sole medical professional with knowledge of the combination— has an even higher duty to ensure that the drug combination is safe and that the prescriptions are being written for valid medical necessities.  The pharmacist has a duty to ensure that the different providers are aware of each other's prescriptions and the drug interactions that may occur.  Dembo did not fulfill these duties.

120.    Additionally, when Dembo filled baclofen for Patient H.L., the prescriber, according to Olive Street records, was Librach.  Dembo knew that prescriptions naming Librach as the prescribing physician should be carefully monitored and filled only after verifying that they were issued for a legitimate medical reason.

121.    When Dembo filled oxycodone for Patient H.L., the prescriber of record was typically Asim Ali (Ali).  Like Librach, Ali was indicted by a federal grand jury on or about

February 13, 2020, for, among other things, illegally prescribing controlled substances in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2.  *See generally United States v. Ali, et al.*, No. 4:20-CR-00098-HEA (E.D. Mo. filed Feb. 13, 2020).

122.    Each time Dembo dispensed an oxycodone prescription to Patient H.L., the cumulative daily MME total was 120, well above the level of daily MMEs that the CDC recommends avoiding.  This continued for approximately one year, at least.

123.    Despite all of these red flags presented by Patient H.L.'s prescriptions, Dembo continued to fill them without resolving the red flags.

124.    The chart attached as Exhibit 6 contains Schedule II and Schedule IV drugs, plus muscle relaxers, that Dembo filled for Patient H.L. from January 2017 to February 2018.  Each of the drugs listed in the chart in Exhibit 6 is a prescription drug under the FDCA.

125.    All prescriptions in Exhibit 6 were billed to the Medicaid federal healthcare program, and some were also paid for by the Medicare federal healthcare program, implicating FCA liability, as indicated.

126.    Medicare paid approximately $470 for Patient H.L.'s prescriptions listed in Exhibit 6.  Based on the red flags described above, Dembo knew that the prescriptions listed in Exhibit 6 were not used for a medically accepted indication and lacked a legitimate medical purpose.  If Medicare had known that these prescriptions were invalid, it would not have paid for them.

127.    Medicaid paid approximately $25 for Patient H.L.'s prescriptions listed in Exhibit 6.  Based on the red flags described above, Dembo knew that the prescriptions listed in Exhibit 6 were not used for a medically accepted indication and lacked a legitimate medical purpose.  If Medicaid had known that these prescriptions were invalid, it would not have paid for

them.

128.    Dembo knowingly dispensed these drugs pursuant to prescriptions that were issued without a legitimate medical purpose and outside the usual course of professional practice in violation of 21 U.S.C. §§ 829(a) and (b), and 842(a)(1), and 21 C.F.R. § 1306.04.

129.    Dembo dispensed these controlled substances while acting outside the usual course of the professional practice of pharmacy in violation of 21 U.S.C. § 842(a)(1) and 21 C.F.R. § 1306.06.

**Count I:**
**Civil Penalties for Unlawful Dispensing of**
**Controlled Substances under the Controlled Substances Act**

130.    The United States realleges and incorporates by reference Paragraphs 1 through 129 of the Complaint as if fully set forth herein.

131.    Dembo knowingly dispensed controlled substances pursuant to prescriptions that were issued without a legitimate medical purpose and outside the usual course of professional practice in violation of 21 U.S.C. §§ 829(a) and (b), and 842(a)(1), and 21 C.F.R. § 1306.04.

132.    Dembo dispensed controlled substances while acting outside the usual course of the professional practice of pharmacy and not in compliance with her "corresponding responsibility" in violation of 21 U.S.C. § 842(a)(1) and 21 C.F.R. §§ 1306.04 and 1306.06.

133.    As a result of the foregoing, Defendant is liable to the United States for a civil penalty in an amount of not more than $67,627 for each violation occurring after November 2, 2015, pursuant to 21 U.S.C. § 842(c)(1)(A) and 28 C.F.R. § 85.5.

**Count II:**
**False or Fraudulent Claims to Medicaid and**
**Medicare for Prescription Drugs in Violation of the False Claims Act**

134.    The United States realleges and incorporates by reference paragraphs 1 through 133 of the Complaint as if fully set forth herein.

135.    Dembo knowingly, or with reckless disregard, presented, or caused to be presented false or fraudulent claims for payment or approval, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

136.    Specifically, Dembo submitted, or caused Olive Street to submit, requests for payment to Medicaid and to Medicare Part D Plan Sponsors for controlled substances and other medications, as specified above, that were invalid and not dispensed for a legitimate medical purpose.

137.    Because of Dembo's acts, the United States suffered damages in an amount to be determined at trial, and therefore is entitled to treble damages under the FCA, plus civil penalties of not less than $5,500 and up to $11,000 per violation for violations that occurred on or before November 2, 2015, and of not less than $11,665 and up to $23,331 for violations that occurred after that date.  31 U.S.C. § 3729(a); 28 C.F.R. § 85.5.

## DEMAND FOR RELIEF

WHEREFORE, the United States respectfully requests that:

A.    As to Count I, judgment be entered in favor of the United States and against Dembo for civil penalties under the CSA, plus interest, costs, and any and all relief that the Court deems just and proper.

      B.      As to Count II, judgment be entered in favor of the United States and against Dembo for treble damages and civil penalties under the FCA, plus interest, costs, and any and all relief that the Court deems just and proper.

                                 Respectfully submitted,

                                 SAYLER A. FLEMING

                               UNITED STATES ATTORNEY

By:   */s/ Amy E. Sestric*
        Amy E. Sestric, #66219MO
        ASSISTANT UNITED STATES ATTORNEY
        Thomas F. Eagleton Courthouse
        111 South Tenth Street, 20th Floor
        St. Louis, Missouri 63102
        (314) 539-2200
        *amy.sestric@usdoj.gov*